## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ———————————————————— )<br>**CONTENT SQUARE SAS and CONTENT** )<br>**SQUARE ISRAEL LIMITED f/k/a** )<br>**CLICKTALE LIMITED,** )<br> )<br> **Plaintiffs,** )<br> )<br> **v.** )<br> )<br>**DECIBEL INSIGHT LIMITED and** )<br>**DECIBEL INSIGHT, INC.,** )<br> )<br> **Defendants.** )<br>———————————————————— ) | **Civil Action No.**<br>**20-11184-FDS** |

## MEMORANDUM AND ORDER ON
## DEFENDANTS' MOTION TO DISMISS

**SAYLOR, C.J.**

This is an action for patent infringement.  Plaintiffs Content Square SAS and Content

Square Israel Limited f/k/a Clicktale Limited ("Clicktale") have sued defendants Decibel Insight

Limited and Decibel Insight, Inc. (collectively, "Decibel") under 35 U.S.C. § 271 for

infringement of five patents allegedly owned by Clicktale.  The patents at issue concern methods

and systems for web analytics.

Decibel has moved to dismiss the complaint for failure to state a claim upon which relief

can be granted.  It contends that each asserted patent is directed to patent-ineligible subject

matter under 35 U.S.C. § 101.  It further contends that Content Square SAS lacks standing and

thus should be dismissed from the action.

For the following reasons, that motion will be granted in part and denied in part.

# I.  Background

## A.  Factual Background

The facts are stated as set forth in the complaint unless otherwise noted.

### 1.  The Parties

Content Square SAS is a company based in France.  (Compl. ¶ 1).  The complaint alleges that it is "the global leader in digital experience analytics providing its customers with granular understandings of user experience on their websites, mobile sites, and applications."  (*Id.* ¶ 12).

Clicktale is a wholly owned subsidiary of Content Square SAS.  (*Id.* ¶ 2).  It is an "experience analytics" company based in Israel.  (*Id.* ¶¶ 2, 13).  It was acquired by Content Square SAS in July 2019, and is now known as Content Square Israel Limited.  (*Id.*).  According to the complaint, upon acquisition, Content Square SAS "integrated Clicktale's key capabilities into its single expanded SaaS (Software as a Service) platform," which "empowers brands to create better experiences by tracking and analyzing customer behavior through billons of anonymous web, mobile and app interactions."  (*Id.* ¶ 13).

Decibel Insight Limited is based in the United Kingdom.  (*Id.* ¶ 3).  Decibel Insight, Inc. is a Delaware corporation based in the United States.  (*Id.* ¶ 4).  The complaint alleges that Decibel's "digital experience analytics platform" infringes one or more claims of five patents owned by Clicktale.  (*Id.* ¶¶ 5-6, 15).

### 2.  Patents in Suit

The complaint asserts the following patents:  U.S. Patent No. 10,079,737 ("the '737 patent"); U.S. Patent No. 10,063,645 ("the '645 patent"); U.S. Patent No. 9,792,365 ("the '365 patent"); U.S. Patent No. 9,508,081 ("the '081 patent"); and U.S. Patent No. 7,941,525 ("the '525 patent").

a.      **The '737 Patent**

The '737 patent is titled "Method and System for Generating Comparable Visual Maps for Browsing Activity Analysis." ('737 patent at Title).  It relates to "a method and system for generating a plurality of comparable visual maps of browsing activity of users."  (*Id.* col. 2 ll. 44-46).  It states that "[a]lthough prior art solutions for monitoring browsing activity collect many details with regard to the activity, such solutions fail to provide an easy and intuitive mechanism for analyzing the gathered information."  (*Id.* col. 2 ll. 6-9).  It includes exemplary screenshots of visual maps generated according to one embodiment:



(*Id.* at Fig. 2B).  In this example, the left map shows mouse movements on a webpage during the preceding week, while the right map shows mouse clicks on the same webpage over the same time period.  (*Id.* col. 5 ll. 31-35).  To produce such maps, a user only needs to choose "the parameter(s) . . . that [he] wishes to analyze."  (*Id.* col. 5 ll. 42-44).  He does not need "to go through the process of selecting a web page and parameters when a comparable visual map is selected, as this information is automatically populated when the user selects the compare button."  (*Id.* col. 5 ll. 39-42).  Each map is then "proportionally resized to a page view on a client device" and "relative to the other map."  (*Id.* col. 5 ll. 52-55).

3

### b.    The '645 Patent

The '645 patent is titled "Method and System for Monitoring and Tracking Browsing Activity on Handled Devices." ('645 patent at Title). It discloses, among other things, "a method for monitoring and tracking browsing activity of a user on a client device." (*Id.* col. 2 ll. 42-44). That method comprises "receiving . . . browsing activity information" and "page information" from a client device—a "handheld device having a touch screen display"—and "generating . . . an exposure map" based on that information. (*Id.* col. 2 ll. 44-52). That exposure map, which is described in one embodiment and by the parties as a "heat map," indicates the "salience of each area of a page-view respective of the page displayed over the client device and visited by the user." (*Id.* col. 2 ll. 52-55; *id.* col. 3 l. 51; Def. Mem. at 11, 12; Pl. Opp. at 1).

### c.    The '365 Patent

The '365 patent is titled "Method and System for Tracking and Gathering Multivariate Testing Data." ('365 patent at Title). It relates generally to "techniques for evaluating changes to a website." (*Id.* col. 1 ll. 14-16). According to the patent, one way to increase webpage traffic is to use multivariate testing, where "different versions of the same webpage are delivered to different users to determine whether users prefer a certain version of that webpage." (*Id.* col. 1 ll. 49-52). The prior art was limited to evaluating changes to one website because there was no tool "for analyzing multivariate tests performed across different websites" or "for gathering multivariate tests performed by different testing services." (*Id.* col. 2 ll. 15-20). The '365 patent discloses "a method for tracking and gathering data respective of multivariate testing on a plurality of webpages." (*Id.* col. 2 ll. 36-38).

### d.    The '081 Patent and the '525 Patent

The '081 patent and the '525 patent are part of the same patent family and share largely

4

similar specifications.  They are titled "Method and System for Monitoring an Activity of a User."  ('081 patent at Title; '525 patent at Title).  They are generally directed to tracking the web-browsing activities of users.  ('081 patent at Abstract; '525 patent at Abstract).  They explain that prior art limited the type of data collected using client-side scripts to "per-page" data, such as URL, referrer, load time, IP, browser type, and screen resolution.  ('081 patent col. 3 ll. 14-16; '525 patent col. 3 ll. 12-14).  They further explain, however, that data accessible to client-side scripts is not limited to such data; instead, it includes "per-action" data, such as mouse movement, webpage scrolling, window resizing, click events, and keyboard use.  ('081 patent col. 3 ll. 20-26; '525 patent col. 3 ll. 18-23).  They state that "it would be desirable to provide a system and method for tracking and analyzing web site traffic" that, among other things, "will collect information beyond traditional 'per-page' data."  ('081 patent col. 3 ll. 63-67; '525 patent col. 3 ll. 56-59).

Using the tracked data, the claimed invention "generat[es] user activity information" to construct a visual replay of a user's activities on a website.  ('525 patent col. 17 ll. 1-5; *see also* '081 patent col. 17 l. 29 ("generating user visiting information"); Compl. ¶ 14 (alleging that Decibel competes with Content Square by automating "session replay" analysis to improve the "digital experiences" of website users)).

### B.     Procedural Background

On June 22, 2020, Content Square SAS and Clicktale filed this action against Decibel. The complaint asserts five counts of patent infringement under 35 U.S.C. § 271:  infringement of the '525 patent (Count 1); infringement of the '081 patent (Count 2); infringement of the '365 patent (Count 3); infringement of the '645 patent (Count 4); and infringement of the '737 patent (Count 5).

Decibel has moved to dismiss the complaint under Fed. R. Civ. P. 12(b)(6) for failure to

state a claim upon which relief can be granted.  It contends that each asserted patent is directed to

patent-ineligible subject matter under 35 U.S.C. § 101.  It further contends that Content Square

SAS lacks standing and thus should be dismissed.

## II.   **Legal Framework**

### A.   **Legal Standard**

To survive a motion to dismiss, a complaint must state a claim that is plausible on its

face.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  For a claim to be plausible, the

"[f]actual allegations must be enough to raise a right to relief above the speculative level . . . ."

*Id.* at 555 (internal citations omitted).  "The plausibility standard is not akin to a 'probability

requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556).  When

determining whether a complaint satisfies that standard, a court must assume the truth of all well-

pleaded facts and give the plaintiff the benefit of all reasonable inferences.  *See Ruiz v. Bally*

*Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75,

77 (1st Cir. 1999)).  Dismissal is appropriate if the complaint fails to set forth "factual

allegations, either direct or inferential, respecting each material element necessary to sustain

recovery under some actionable legal theory."  *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir.

2008) (quoting *Centro Medico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 6 (1st Cir.

2005)).

Whether a claim is drawn to patent-eligible subject matter under 35 U.S.C. § 101 is an

issue of law.  *Genetic Techs. Ltd. v. Merial LLC*, 818 F.3d 1369, 1373 (Fed. Cir. 2016).  Courts

have therefore occasionally decided the issue of § 101 patent-eligibility at the pleadings stage.

*See, e.g.*, *Rothschild Digital Confirmation, LLC v. Skedulo Holdings Inc.*, 2020 WL 1307016, at

*2 (N.D. Cal. Mar. 19, 2020).  But "like many legal questions," determining eligibility under §

101 can involve "subsidiary fact questions"—in particular, the second step of the *Alice/Mayo*
test, which asks whether a patent's claims contain a sufficiently inventive concept.  *See Aatrix
Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1128 (Fed. Cir. 2018).  Thus,
while the Federal Circuit has held that "patent eligibility can be determined at the Rule 12(b)(6)
stage," it has also cautioned that "[t]his is true only when there are no factual allegations that,
taken as true, prevent resolving the eligibility question as a matter of law."  *Id.* at 1125.

B.     **Statutory Framework**

An invention is generally patentable if it qualifies as a "new and useful process, machine,
manufacture, or composition of matter."  35 U.S.C. § 101.  However, "this provision contains an
important implicit exception.  Laws of nature, natural phenomena, and abstract ideas are not
patentable."  *Mayo Collaborative Servs. v. Prometheus Labs.*, 566 U.S. 66, 70 (2012) (internal
quotation marks and citations omitted).  When applying that exception, a court "must distinguish
between patents that claim the building blocks of human ingenuity and those that integrate the
building blocks into something more."  *Alice Corp. v. CLS Bank Intern.*, 573 U.S. 208, 217
(2014) (internal quotation marks, alterations, and citations omitted).

The framework for making that distinction comprises two steps.  At step one, the court
determines "whether the claims at issue are directed to one of those patent-ineligible concepts"
that is so abstract as to "risk disproportionately tying up the use of [] underlying ideas."  *Id.* at
217 (quoting *Mayo*, 566 U.S. at 73).  If the claims at issue are directed to a patent-ineligible
concept, the court continues to step two.  At step two, the court looks for an "inventive concept,"
namely "an element or combination of elements that is sufficient to ensure that the patent in
practice amounts to significantly more than a patent upon the ineligible concept itself."  *Id.* at
217-18 (internal quotation marks, alterations, and citations omitted).  If the claims lack an
inventive concept, then the patent claims subject matter that is not patent-eligible, and the claims

7

are therefore invalid.

## III.    <u>Analysis</u>

### A.    <u>Standing</u>

Defendants contend that Content Square SAS lacks standing and thus should be dismissed as a plaintiff.  They reason that the complaint fails to allege that Content Square SAS is the owner, assignee, or exclusive licensee of the patents or that Clicktale licensed the patents to Content Square SAS.

"Standing to sue for patent infringement derives from the Patent Act, which provides that '[a] patentee shall have remedy by civil action for infringement of his patent.'"  *Prima Tek II, LLC v. A-Roo Co.*, 222 F.3d 1372, 1376-77 (Fed. Cir. 2000) (quoting 35 U.S.C. § 281).  The term "patentee" includes "not only the patentee to whom the patent was issued but also the successors in title to the patentee."  35 U.S.C. § 100(d).  "When the entity that holds legal title to the patent makes an assignment of all substantial rights under the patent, then that assignee is deemed the effective 'patentee' under 35 U.S.C. § 281 with effective title to the patent, and alone has standing to maintain an infringement suit in its own name."  *Keranos, LLC v. Silicon Storage Tech., Inc.*, 797 F.3d 1025, 1031 (Fed. Cir. 2015) (internal quotation marks and emphasis omitted).

Under some circumstances, an exclusive license—which provides the licensee not only the right to practice the patented invention within a given territory but also the right to exclude others from making, using, or selling the invention—is "tantamount to an assignment" of the patent.  *Alfred E. Mann Foundation for Scientific Research v. Cochlear Corp.*, 604 F.3d 1354, 1359 (Fed. Cir. 2010).  That occurs when the licensor transfers "all substantial rights" in the patent to the licensee.  *Id.* (citing *Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA*, 944 F.2d 870, 873-74 (Fed. Cir. 1991)).  In such cases, the exclusive licensee has "sole standing" to

sue those suspected of infringement.  *See id.*  The licensor, who transferred away sufficient rights

to divest it of any right to sue, no longer has standing.  *See id.*  But when an exclusive licensor

transfers "less than all substantial rights" in the patent to the licensee, "the exclusive licensee

may still be permitted to bring suit against infringers, but the patent owner is an indispensable

party who must be joined."  *Id.* (internal quotation marks omitted).

 The key inquiry, therefore, is whether the licensor transferred "all substantial rights" to

the licensee.  *See id.* at 1359-60 ("[T]he question is whether the license agreement transferred

sufficient rights to the exclusive licensee to make the licensee the owner of the patents in

question.  If so, the licensee may sue but the licensor may not.  If not, the licensor may sue, but

the licensee alone may not.").  The Federal Circuit has not "establish[ed] a complete list of the

rights whose holders must be examined to determine whether a licensor has transferred away

sufficient rights to render an exclusive licensee the owner of a patent."  *Id.* at 1360.  However, it

has identified "at least some of the rights that should be examined":

> Of course, transfer of the exclusive right to make, use, and sell products or
> services under the patent is vitally important to an assignment.  We have also
> examined the scope of the licensee's right to sublicense, the nature of license
> provisions regarding the reversion of rights to the licensor following breaches of
> the license agreement, the right of the licensor to receive a portion of the recovery
> in infringement suits brought by the licensee, the duration of the license rights
> granted to the licensee, the ability of the licensor to supervise and control the
> licensee's activities, the obligation of the licensor to continue paying patent
> maintenance fees, and the nature of any limits on the licensee's right to assign its
> interests in the patent.  Frequently, though, the nature and scope of the exclusive
> licensee's purported right to bring suit, together with the nature and scope of any
> right to sue purportedly retained by the licensor, is the most important
> consideration.

*Id.* at 1360-61 (internal citations omitted).

 Here, the complaint alleges that each of the asserted patents is assigned to Clicktale and

that Clicktale "owns *all* right, title, and interest" in each patent.  (Compl. ¶¶ 17, 20, 23, 26, 29

(emphasis added)).  It further alleges that Clicktale is a wholly owned subsidiary of Content

Square SAS.  (*Id.* ¶ 2).  A parent-subsidiary relationship, however, is insufficient by itself to give

a parent standing to sue for patent infringement on behalf of its patent-holding subsidiary.  *See*

*Digitech Image Techs., LLC v. Newegg Inc.*, 2013 WL 1871513, at *3-4 (C.D. Cal. May 3,

2013).

Plaintiffs have supplemented their complaint with an affidavit from Arnaud Gouachon,

the Chief Legal Officer of Content Square SAS and Clicktale.  (Pl. Opp. Ex. 8 ("Gouachon

Decl.") ¶ 1).[1]  He states that Content Square SAS "has an exclusive implied license from

[Clicktale] to practice the Asserted Patents in the United States."  (*Id.* ¶ 4).  That conclusory

statement provides no detail concerning the nature and scope of the rights that were purportedly

transferred from Clicktale to Content Square SAS.  The affidavit does, however, provide some

details concerning the level of control that Content Square SAS has over the asserted patents in

light of its control over Clicktale:

- Clicktale has "no operations that are separate" from Content Square SAS or "that are
  not controlled" by Content Square SAS.  (*Id.* ¶ 2).

- Content Square SAS practices the asserted patents in the United States.  (*Id.* ¶ 5).

- Clicktale cannot prevent Content Square SAS "from exercising its rights as an
  implied exclusive licensee, given [Content Square SAS's] complete control over
  [Clicktale]."  (*Id.* ¶ 6).

- Clicktale cannot "initiate any action with respect to patents it holds unless directed to

---

[1] It is well-settled that "it is within the trial court's power to allow or to require the plaintiff to supply, by
amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of
plaintiff's standing."  *Warth v. Seldin*, 422 U.S. 490, 501 (1975); *see also Wilson v. HSBC Mortg. Servs., Inc.*, 744
F.3d 1, 7 (1st Cir. 2014) ("[W]here . . . standing is at issue we may consider further particularized allegations of fact
deemed supportive of plaintiffs' standing, such as those contained within an affidavit." (internal quotation marks and
alterations omitted)).

take those actions" by Content Square SAS.  (*Id.*).

- Clicktale cannot grant a license to the asserted patents "unless directed to do so" by Content Square SAS.  (*Id.* ¶ 7).

- To the extent that royalties are paid for the asserted patents in this case, those payments would be made to Content Square SAS.  (*Id.* ¶ 3).

The affidavit thus contradicts the complaint, which states that Clicktale owns "all" right, title, and interest in each patent.  Moreover, the statements in the affidavit amount to little more than a description of the practical effect of a parent-subsidiary relationship.  And there is no indication of a license embodied in any kind of writing.[2]  All of that makes it difficult to assess standing at this stage.

The fact that the record is so limited is reason enough to dismiss the claims of Content Square SAS for lack of standing.  Indeed, standing is a jurisdictional bar that plaintiffs bear the burden of clearing.  *See Tyco Healthcare Grp. LP v. Ethicon Endo-Surgery, Inc.*, 587 F.3d 1375, 1378 (Fed. Cir. 2009).

However, it is clear, even on this limited record, that at least one party—either Clicktale

---

[2] It is unclear whether an unwritten grant of an exclusive license that transferred "all substantial rights" in the patents would be a valid transfer of patent rights.  The Patent Act specifies how patents may be assigned and exclusive rights to patents may be conveyed:

> Applications for patent, patents, or any interest therein, shall be assignable in law by an instrument in writing.  The applicant, patentee, or his assigns or legal representatives may in like manner grant and convey an exclusive right under his application for patent, or patents, to the whole or any specified part of the United States.

35 U.S.C. § 261.  The Federal Circuit has stated that "an exclusive license need not be in writing for the exclusive licensee to have standing to sue with the patentee as a co-plaintiff."  *Aspex Eyewear, Inc. v. Altair Eyewear, Inc.*, 288 F. App'x 697, 705 (Fed. Cir. 2008).  However, it has further explained that "exclusive license agreements that convey all substantial rights . . . must be in writing for a party to have standing to sue in its own name."  *Id.* "Common corporate structure does not overcome the requirement that even between a parent and a subsidiary, an appropriate written assignment is necessary to transfer legal title from one to the other."  *Abraxis Bioscience, Inc. v. Navinta LLC*, 625 F.3d 1359, 1366 (Fed. Cir. 2010).

or Content Square SAS—has standing; what is unclear is whether it is one, the other, or both. For that reason, there is little apparent harm in proceeding to discovery to the extent that the asserted claims are patent-eligible under 35 U.S.C. § 101. Discovery may reveal additional information concerning the standing question. In any event, the issue can be revisited by the Court on a more complete record.

Accordingly, the Court will deny, without prejudice, defendants' motion to dismiss the claims of Content Square SAS for lack of standing.

### B.      Patent Eligibility under 35 U.S.C. § 101

The parties agree that claim 1 of each patent is representative of the asserted claims for purposes of deciding the present motion. (*See* Def. Mem. at 5, 12, 15, 19; Pl. Opp. at 2 n.3). The Court will therefore assess whether the asserted claims are valid under § 101 based on those claims. *See Berkheimer v. HP Inc.*, 881 F.3d 1360, 1365 (Fed. Cir. 2018) ("Courts may treat a claim as representative in certain situations, such as . . . if the parties agree to treat a claim as representative.").

### 1.      The '737 Patent

Claim 1 of the '737 patent recites a method for generating comparable visual maps of browsing activity of users. ('737 patent col. 10 ll. 51-67; *id.* col. 11 ll. 1-11). That method comprises (1) "receiving" and "retrieving" two datasets of user browsing activity, (2) "generating" and "scaling" two visual maps based on those datasets to provide "comparable visual representation of values of their respective data sets relative to each other," and (3) "displaying" the maps "simultaneously" and "over a respective representation of the content of the webpage." (*Id.*).

### a.      Step One:  Patent-Ineligible Concept

The Federal Circuit has "repeatedly held" that "collecting, analyzing, and displaying

12

data" are "abstract concepts." *CardioNet, LLC v. InfoBionic, Inc.*, 816 F. App'x 471, 475 (Fed. Cir. 2020) (citing *Electric Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353-54 (Fed. Cir. 2016); *Content Extraction & Transmission LLC v. Wells Fargo Bank, National Ass'n*, 776 F.3d 1343, 1347 (Fed. Cir. 2014)).  In *Electric Power Group, LLC v. Alstom S.A.*, 830 F.3d 1350 (Fed. Cir. 2016), the court explained that claims reciting those concepts—either individually or collectively—"fall into a familiar class of claims" directed to patent-ineligible concepts:

> Information as such is intangible.  Accordingly, we have treated *collecting* information, including when limited to particular content (which does not change its character as information), as within the realm of abstract ideas.  In a similar vein, we have treated *analyzing* information by steps people go through in their minds, or by mathematical algorithms, without more, as essentially mental processes within the abstract-idea category.  And we have recognized that merely *presenting* the results of abstract processes of collecting and analyzing information, without more (such as identifying a particular tool for presentation), is abstract as an ancillary part of such collection and analysis.

*Id.* at 1353-54 (internal citations omitted; emphases added).

The claims at issue in *Electric Power Group* recited receiving, analyzing, and displaying power-grid data.  *See id.* at 1351-52.  The court found that they were directed to an abstract idea because "[t]he advance they purport to make is a process of gathering and analyzing information of a specified content, then displaying the results, and not any particular assertedly inventive technology for performing those functions."  *Id.* at 1354.  They "focused on the combination of those abstract-idea processes," which rendered the claims directed to patent-ineligible concepts. *Id.*

The same can be said about claim 1 of the '737 patent.  It recites a series of steps comprising "retrieving" user web-browsing data based on selected parameters, "generating" and "scaling" visual maps of that data, and "displaying" those maps.  ('737 patent col. 10 ll. 51-67; *id.* col. 11 ll. 1-11).  It recites nothing more than the collection, analysis, and presentation of information, which have been found—individually and collectively—to be abstract concepts.

13

*See Electric Power*, 830 F.3d at 1353-54 (collecting cases).  It does not recite "inventive

technology for performing those functions."  *Id.* at 1354; *see also Trading Techs. Int'l, Inc. v.*

*IBG LLC*, 921 F.3d 1378, 1384-85 (Fed. Cir. 2019) ("*Trading Techs. II*") ("[T]he claimed steps

for calculating the P&L values . . . is nothing more than mere automation of manual processes

using generic computers, which does not constitute a patentable improvement in computer

technology. . . .  [T]he claims here fail because arranging information along an axis does not

improve the functioning of the computer, make it operate more efficiently, or solve any

technological problem." (internal quotation marks and citations omitted)); *CardioNet*, 816 Fed.

App'x at 475 ("[T]he claims and specifications treat those steps as conventional processes, and

therefore the claims cannot be said to require anything more than generic data analysis. . . .

[M]erely displaying data by conventional methods as part of a series of abstract steps is itself an

abstract concept.").

The failure to recite inventive technology distinguishes claim 1 from those in the cases on

which plaintiffs rely.  For example, plaintiffs note that the Federal Circuit has found that "claims

directed to 'an improved user interface for electronic devices' were patent-eligible."  (Pl. Opp. at

5 (quoting *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356, 1363 (Fed. Cir.

2018))).  That is true.  But in *Core Wireless*, the court emphasized that the disclosed invention

improved the "functioning of computers" and the "efficiency of using the electronic device" as

compared to the prior art.  *See Core Wireless*, 880 F.3d at 1363.  Indeed, language in the relevant

specification "clearly indicate[d] that the claims are directed to an improvement in the

functioning of computers, particularly those with small screens."  *Id.*  Likewise, in *DDR*

*Holdings, LLC v. Hotels.com*, 773 F.3d 1245 (Fed. Cir. 2014), the court underscored the fact that

"the claimed solution is necessarily rooted in computer technology in order to overcome a

problem specifically arising in the realm of computer networks." *Id.* at 1257.

No such technology for improving the functionality of computers is disclosed here. Instead, "the claims are focused on providing information . . . in a way that helps [users] process information more quickly, not on improving computers or technology." *Trading Techs. II*, 921 F.3d at 1384.  Claim 1 purports to improve upon the prior art by disclosing a method for generating side-by-side scaled visual maps of user-browsing data in a single window.  Yet that improvement merely concerns how such data is displayed, which is not enough to make the claim directed to patent-eligible subject matter.  *See CardioNet*, 816 Fed App'x at 476 ("[D]isplaying data, including displaying two data series on the same time axis, is not the sort of improvement to existing technological processes and computer technology capable of establishing the eligibility of computer-implemented method claims and does not make the claimed methods non-abstract despite its alleged utility." (internal quotation marks, citations, and alterations omitted)); *Trading Techs. II*, 921 F.3d at 1384 ("The only difference between the trading screen of [the prior art] and the one claimed is that the axis in [the prior art] displays price values, and the claimed axis displays P&L values. . . .  Information, whether displayed in the form of price values or P&L values, is abstract.").  In short, "the focus of the claims is not on such an improvement in computers as tools, but on certain independently abstract ideas that use computers as tools." *Electric Power Grp.*, 830 F.3d at 1354.

Accordingly, the Court finds that claim 1 of the '737 patent is directed to the abstract concepts of collecting, analyzing, and displaying web-browsing information.

### b.      Step Two:  Inventive Concept

The Court must next examine the elements of claim 1 to determine whether it contains an "inventive concept sufficient to transform the claimed abstract idea into a patent-eligible application." *Alice*, 573 U.S. at 221 (internal quotation marks omitted).

That examination requires the court to "consider the elements of each claim both individually and as an ordered combination." *Id.* at 217 (internal quotation marks omitted).  The inquiry searches for "an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Id.* at 217-18 (internal quotation marks and alteration omitted).  "An inventive concept reflects something more than the application of an abstract idea using 'well-understood, routine, and conventional activities previously known to the industry.'" *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1316 (Fed. Cir. 2019) (quoting *Aatrix Software*, 882 F.3d at 1128).  "The question of whether a claim element or combination of elements is well-understood, routine and conventional to a skilled artisan in the relevant field is a question of fact." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018).

Here, claim 1 lacks the necessary inventive concept, whether viewed individually or in ordered combination.  Instead, it merely recites the abstract ideas themselves.  It is well-established that "[t]he inventive concept necessary at step two of the *Mayo/Alice* analysis cannot be furnished by the unpatentable law of nature (or natural phenomenon or abstract idea) itself." *Genetic Techs. Ltd. v. Merial LLC*, 818 F.3d 1369, 1376 (Fed. Cir. 2016).  Under these circumstances, there are no "additional elements" that "transform the nature of the claim into a patent-eligible application." *Alice*, 573 U.S. at 217 (internal quotation marks omitted); *see also id.* ("First, we determine whether the claims at issue are directed to one of those patent-ineligible concepts.  If so, we then ask, what else is there in the claims before us?" (internal quotation marks, citations, and alteration omitted)).  Here, the claim consists exclusively of the abstract concepts of collecting, analyzing, and displaying user-browsing data; it therefore does not contain an inventive concept that transforms the nature of the claim into a patent-eligible

16

application.[3]

Claim 1 fares no better when the elements are considered as an ordered combination. The ordering of steps is conventional:  first "retrieving" data based on selected parameters, then "generating" and "scaling" visual maps of that data, and finally "displaying" those maps.  ('737 patent col. 10 ll. 51-67; *id.* col. 11 ll. 1-11).  That order is not inventive at all, let enough sufficiently inventive to save the claim.  *See Two-Way Media Ltd. v. Comcast Cable Comms., LLC*, 874 F.3d 1329, 1339 (Fed. Cir. 2017) ("The claim uses a conventional ordering of steps— first processing the data, then routing it, controlling it, and monitoring its reception—with conventional technology to achieve its desired result. . . .  We thus find that claim 1 here fails to transform the abstract idea into something more.").  In fact, the claimed order is the only one possible:  data must be collected before it is analyzed, and it must be analyzed before it is displayed in a useful visual.

Accordingly, claim 1 of the '737 patent is directed to abstract ideas and fails to recite an inventive concept.  It is therefore patent ineligible under 35 U.S.C. § 101.  The Court will grant defendants' motion to dismiss the claim of infringement of the '737 patent.

## 2.    The '645 Patent

Claim 1 of the '645 patent recites "[a] method for monitoring and tracking browsing activity of a user on a client device."  ('645 patent col. 10 ll. 56-57).  That method comprises (1) "receiving" browsing-activity information and page information from the client device, (2)

---

[3] Plaintiffs contend that the "generating" and "scaling" steps of claim 1 are "improvements to the underlying technology that comprise inventive concepts." (Pl. Opp. at 6).  But those are themselves abstract concepts concerning how the data is displayed. *See, e.g.*, *CardioNet*, 816 F. App'x at 476 ("[D]isplaying data, including displaying two data series on the same time axis, is not the sort of improvement to existing technological processes and computer technology capable of establishing the eligibility of computer-implemented method claims and does not make the claimed methods non-abstract despite its alleged utility." (internal citations, quotation marks, and alterations omitted)).  They therefore cannot represent the necessary inventive concept.

"creating a reference layout" of at least one of the pages displayed on the client device, and (3) "generating" an "exposure map" based on that information "mapped to overlay the reference layout." (*Id.* col. 10 ll. 56-67; *id.* col. 11 ll. 1-11).

### a.   Step One:  Patent-Ineligible Concept

As explained, it is well-settled that "collecting, analyzing, and displaying data" are abstract ideas that are patent-ineligible concepts. *CardioNet*, 816 F. App'x at 475; *see also Electric Power*, 830 F.3d at 1353-54.  At first blush, it appears that claim 1 of the '645 patent suffers from the same defect as claim 1 of the '737 patent:  it recites a series of steps—namely, "receiving" webpage-browsing information, "creating" a reference layout of the underlying webpage, and "generating" a heat map based on that data—that is directed to patent-ineligible concepts.  *See Electric Power*, 80 F.3d at 1353-54.

But two components of the disclosed method distinguish it from the method disclosed by claim 1 of the '737 patent.  The first is calculation of the "salience of each area of a page-view" based on the browsing information.  ('645 patent col. 11 ll. 4-5).  The specification describes how salience is calculated:

> [T]o determine the salience of the visible area, the delta time spans of all viewport instances respective of the mapped viewports are computed as a weighted sum.  In one embodiment, the weight can be assigned according to the viewport zoom level.  For example, a pageview that includes a certain paragraph is exposed in a viewport twice, each time for y seconds.  The first time it is zoomed in more than the second time (e.g., 3x).  The total pageview salience for this paragraph is y+y.  However, when assigning a weight to the viewport zoom levels the pageview salience for this paragraph would be y+3y[.]  Other functions can be utilized instead of a weighted sum, for example, a sum or a binary 'OR' function.

(*Id.* col. 9 ll. 14-27).  Plaintiffs contend that this "highly-technical process . . . address[es] a specific problem in the prior art identified in the specification."  (Pl. Opp. at 10).

That appears to mischaracterize the nature of the salience-calculation algorithm.  On its face, it is not highly technical; it consists of simple arithmetic.  And the Federal Circuit has made

clear that basic algorithms normally fall within the realm of abstract concepts.  *See Electric Power*, 830 F.3d at 1354 ("[W]e have treated analyzing information by steps people go through in their minds, or by mathematical algorithms, without more, as essentially mental processes within the abstract-idea category.").

The second component that distinguishes claim 1 of the '645 patent from claim 1 of the '737 patent—the creation and use of a "reference layout"—appears to be a more helpful line of analysis for plaintiffs.  The specification describes the reference layout as a "characteriz[ation]" of a webpage because it has a layout different than that of the webpage itself to compensate for differences in how the webpage is displayed across different devices.  ('645 patent col. 8 ll. 17-19).  It further describes how reference layouts may be created, including by rendering webpages and inspecting the location of each element in the rendered webpage, and how viewport instances are then mapped to the reference layout.  (*Id.* col. 8 ll. 28-63).

Defendants contend that these steps are merely abstract data-processing steps because "no new methods for webpage rendering are disclosed."  (Def. Mem. at 13).  They also note that a recent decision from the District of Delaware involving the same patents concluded that claim 1 of the '645 patent is directed to an abstract idea.  *See Content Square SAS v. Quantum Metric, Inc.*, No. 20-cv-832-LPS (D. Del. Mar. 18, 2021).

It is true that the specification does not describe new rendering methods.  But that may focus too narrowly on a single step in the creation of the reference layout and ignore its larger role in the method disclosed by claim 1.  The specification explains the challenge associated with creating exposure maps for the same webpage when that webpage is viewed across multiple displays:

> [T]he same web page is typically rendered differently on different devices, and
> with different layouts.  This is due to the fact that different devices display the

same web page differently, because of different types of display, browsers, operating systems, and so on.  Thus, each pageview may be characterized with a layout being different from the layout of the web page (hereinafter the "reference layout").

('645 patent col. 8 ll. 12-19).  A reference layout is used to ensure that "the aggregation of viewport instances [is] performed invariant to the layout of the pageviews as displayed on the client devices."  (*Id.* col. 8 ll. 23-25).

The use of a reference layout thus appears to be a "specific technological improvement that was not present in the prior art."  *See Hypermedia Navigation LLC v. Facebook, Inc.*, 2018 WL 3932434, at *4 (N.D. Cal. Aug. 16, 2018).  It goes beyond simply gathering, analyzing, and displaying information by addressing a technological problem:  aggregating viewport instances of a webpage when it is viewed across different mobile devices.  It is not the generation of the reference layout itself that makes the claim directed to more than abstract concepts; it is the process of aggregating viewport instances—using a reference layout—that constitutes a patent-eligible process.  *See id.* ("Plaintiff adequately alleges that the present invention improves a specific online search mechanism by creating web programs that are geared towards entertaining and presenting the user with desirable information in a new way: through "linearly linked websites."); *see also CLS Bank Int'l v. Alice Corp.*, 717 F.3d 1269, 1302 (Fed. Cir. 2013) (Lourie, J., concurring) (The key to this inquiry is whether the claims tie the otherwise abstract idea to a *specific way* of doing something with a computer, or a *specific computer* for doing something; if so, they likely will be patent eligible, unlike claims directed to *nothing more than the idea* of doing that thing on a computer.").  Unlike claim 1 of the '737 patent, claim 1 of the '645 patent appears to solve a "technological problem," *Trading Techs. II*, 921 F.3d at 1384, which places it outside the "familiar class of claims directed to a patent-ineligible concept." *Electric Power*, 830 F.3d at 1353 (internal quotation marks omitted).

20

As noted, a judge in the District of Delaware recently concluded that claim 1 of the '645 patent is directed to an abstract idea. *See Content Square SAS v. Quantum Metric, Inc.*, No. 20-cv-832-LPS (D. Del. Mar. 18, 2021). That decision considered the eligibility of the '737 patent and the '645 patent together, without acknowledging at least one difference—the use of a reference layout to aggregate viewport instances—between the patents. *See id.* at 4-5. For the reasons indicated, it appears that that difference is material and compels a different result. The Court further notes that it is possible that on a complete factual record the outcome may prove to be different, and that there is in fact less to the claimed invention than meets the eye. The resolution of that question is for another day.

Accordingly, the Court concludes, on the present record, that claim 1 of the '645 patent is not directed to an abstract idea. Therefore, the Court will not proceed to the second step of the *Alice* inquiry, and defendants' motion to dismiss the claim of infringement of the '645 patent will be denied.

### 3. The '365 Patent

Claim 1 of the '365 patent recites the following:

A method for tracking and gathering data respective of multivariate testing on a plurality of webpages, comprising:

crawling through a plurality of servers hosting the plurality of webpages;

for each uniform resource locator (URL) of a webpage of the plurality of webpages encountered during the crawling:

sending a request to download the webpage identified by the URL;

downloading at least one page view of the webpage;

analyzing the at least one downloaded page view to identify data related to at least a multivariate test; and

saving data identifying the at least multivariate test performed in the plurality of webpages in a data store.

('365 patent col. 10 ll. 18-33).

### a.        Step One:  Patent-Ineligible Concept

The concept of collecting data, recognizing a subset of that data, and storing that subset is

an abstract idea.  *See Content Extraction*, 776 F.3d at 1347.  The Federal Circuit's decision in

*Content Extraction*, in which the court considered claim 1 of U.S. Patent No. 5,258,855 ("the

'855 patent"), is instructive here.  That claim recited the following:

> A method of processing information from a diversity of types of hard copy
> documents, said method comprising the steps of:
>
> > (a) receiving output representing a diversity of types of hard copy
> > documents from an automated digitizing unit and storing information from
> > said diversity of types of hard copy documents into a memory, said
> > information not fixed from one document to the next, said receiving step
> > not preceded by scanning, via said automated digitizing unit, of a separate
> > document containing format requirements;
> >
> > (b) recognizing portions of said hard copy documents corresponding to a
> > first data field; and
> >
> > (c) storing information from said portions of said hard copy documents
> > corresponding to said first data field into memory locations for said first
> > data field.

('855 patent col. 16 ll. 19-34).  That method could be performed, for example, by software on an

ATM machine that recognizes information on a scanned check and populates data fields with

that information in a computer's memory.  *See Content Extraction*, 776 F.3d at 1345.  The court

held that the claim was directed to an abstract concept and thus failed at step one of the *Alice*

analytical framework:

> [W]e agree with the district court that the claims of the asserted patents are drawn
> to the abstract idea of 1) collecting data, 2) recognizing certain data within the
> collected data set, and 3) storing that recognized data in a memory.  The concept
> of data collection, recognition, and storage is undisputedly well-known.  Indeed,
> humans have always performed these functions.

*Id.* at 1347.

Claim 1 of the '365 patent is directed to the same concept.  It recites a method comprising (1) "crawling" through multiple webpage servers, (2) "sending" requests to download webpages, (3) "downloading" a page view of each webpage, (4) "analyzing" the downloaded webpage "to identify data related to . . . a multivariate test," and (5) "saving" that data.  ('365 patent col. 10 ll. 18-33).[4]  Those steps amount, in essence, to collecting a set of data, recognizing a subset of that data, and storing that subset.

Plaintiffs contend that such an understanding "improperly divorces claim 1 from the technical description of the 'analyzing' limitation in the embodiments described in the specification."  (Pl. Opp. at 13).  It is unclear why that is so—or, more significantly, how that would make claim 1 patent eligible.  Claim 1 of the '855 patent in *Content Extraction* was directed to the abstract concept of "recognizing certain data within the collected data set."  *See Content Extraction*, 776 F.3d at 1347.  Implicit in "recognizing certain data" is analyzing the collected data to identify the "certain data" to be "recogniz[ed]."  That is precisely what claim 1 of the '365 patent recites.  ('365 patent col. 10 ll. 28-30 ("*analyzing* the at least one downloaded page view *to identify data* related to at least a multivariate test")).  The fact that the specification provides a technical description of the "analyzing" limitation in certain embodiments does not dictate otherwise; the limitation remains directed to an abstract concept.  *See Content Extraction*, 776 F.3d at 1347 ("CET argues that its claims are not drawn to an abstract idea because human minds are unable to process and recognize the stream of bits output by a scanner.  However, . . . [s]imilar to how the computer-implemented claims in *Alice* were directed to 'the concept of

---

[4] The specification explains that crawling "can be performed using conventional web crawling techniques." ('365 patent col. 4 ll. 46-47).  The crawling process "typically starts with seed URLs."  (*Id.* col. 4 ll. 48-49).  Upon visiting the seed URLs, it then "identifies all the hyperlinks in the webpage and adds them to the list of URLs to visit in a crawl frontier."  (*Id.* col. 4 ll. 50-51).  Those additional URLs "are recursively visited according to a set of policies."  (*Id.* col. 4 ll. 51-53).

intermediated settlement,' and the claims in *Dealertrack* were directed to the concept of 'processing information through a clearinghouse,' CET's claims are drawn to the basic concept of data recognition and storage." (internal citations omitted)).

Plaintiffs also rely on the Federal Circuit's decision in *SRI International v. Cisco Systems, Inc.*, 930 F.3d 1295 (Fed. Cir. 2019).  In that case, the asserted claim was directed to "deploying a plurality of network monitors in the enterprise network," "detecting by the network monitors, suspicious network activity based on analysis of network traffic data," "generating, by the monitors, reports of said suspicious activity," and "receiving and integrating the reports of suspicious activity, by one or more hierarchical monitors."  *Id.* at 1301.  The court found that the claim was not directed to an abstract concept because it was "directed to using a specific technique—using a plurality of network monitors that each analyze specific types of data on the network and integrating reports from the monitors—to solve a technological problem arising in computer networks:  identifying hackers or potential intruders into the network."  *Id.* at 1303.

Here, however, the "focus of the claims" is not "on [any] specific asserted improvement in computer capabilities," such as "providing a network defense system that monitors network traffic in real-time to automatically detect large-scale attacks."  *Id.* (quoting *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335-36 (Fed. Cir. 2016)).  It is instead "directed to just analyzing data from multiple sources."  *Id.*  It is "drawn to using computers as tools"—tools to evaluate changes across multiple webpages—"rather than improving the functionality of computers and computer networks themselves."  *Id.* (citing *Electric Power*, 830 F.3d at 1354).  It does not, for example, alter or override the routine and conventional operation of a computer or a computer network.  *See id.* (citing *DDR Holdings*, 773 F.3d at 1258).  Any comparison to the asserted claim in *SRI* is therefore inapposite.

Accordingly, claim 1 of the '365 patent is directed to the abstract concepts of collecting data, recognizing a subset of that data, and storing that subset.

  **b.**  <u>**Step Two:  Inventive Concept**</u>

The Court must next consider whether claim 1 of the '365 patent contains an inventive concept that transforms the abstract concepts into a patent-eligible application.  *See Alice*, 573 U.S. at 221.

Plaintiffs identify two elements as sufficiently inventive to save the claim.  First, they contend that the specification indicates that "crawling" and "analyzing" webpages are not conventional tasks and "describe technological improvements" disclosed in claim 1's limitation. But the use of crawling, at least by itself, does not save claim 1.  The specification explains that "the crawling can be performed using conventional web crawling techniques." ('365 patent col. 4 ll. 46-47).  A claim's invocation of conventional components or techniques cannot save it at the second step.  *See, e.g.*, *Alice*, 573 U.S. at 225.

It is not clear at this stage, however, whether the analysis claimed by the patent is conventional, either by itself or in combination with the other claim elements.  The specification describes types of analysis that can be performed to detect data related to a multivariate test. (*See* '365 patent col. 5 ll. 15-58).  Even though "analyzing" the page view "to identify data" related to a multivariate test is directed to an abstract concept, the means to undertake that analysis, particularly when used as part of the larger claim, could conceivably offer a saving inventive concept.  Defendants do not contend otherwise, at least at this stage.  Where, as here, the second step of the *Alice* test turns on a "subsidiary fact question" on a motion to dismiss, determining eligibility under § 101 is inappropriate.

Accordingly, the Court cannot conclude at this stage that claim 1 of the '365 patent does not include a sufficiently inventive concept.  Defendants' motion to dismiss the claim based on

infringement of the '365 patent will therefore be denied.

### 4.        The '081 Patent and the '525 Patent

The Court, like the parties, will consider the validity of the representative claims of the

'081 patent and the '525 patent together in light of the similarities between the claims and

specifications.  Claim 1 of the '081 patent and claim 1 of the '525 patent recite methods for

tracking an activity of a user.  ('081 patent col. 17 l. 18; '525 patent col. 16 l. 59).  Specifically,

claim 1 of the '081 patent recites a method comprising:

> receiving, by a tracking element, compressed user activity information
> representative of activities performed by the user during a visit to a web page,
> wherein the user activity information includes at least a position and a size of each
> element of a portion of the web page related to the user activity;
>
> receiving, by the tracking element, web page content information representative
> of web page content displayed to the user during the visit;
>
> decompressing the compressed user activity information;
>
> generating user visit information by the tracking element, in response to the user
> activity information and in response to the web page content information; and
>
> compensating for differences between a visual representation, on a tracking
> display, of the web page and between a visual representation of the web page on
> another display.

('081 patent col. 17 ll. 18-35).  Claim 1 of the '525 patent recites a method comprising:

> downloading, over a network, web page content that comprises a tracking code;
>
> tracking, at least partially by executing the tracking code by a user computer, user
> activities that are responsive to at least a portion of the downloaded web page
> content;
>
> associating each user activity with properties of the user activity;
>
> generating user activity information consisting of each tracked activity and its
> associated properties, wherein the properties of the user activity are associated
> with a position and size of each element of a portion of a web page related to the
> user activity, thereby providing the user activity information an invariant form in
> which the user activity information is relative to the position and size of the each
> associated elements of the portion of the web pace;

26

wherein the user activity information in the invariant form further allow for a compensation of differences between visual representations, wherein the compensation comprises converting, in a non-linear transformation, information within the user activity information representative of the position and size of the each associated element of the portion of the web pace to a different position and a different size for a playback display, wherein the non-linear transformation comprises con verting the each associated element of the portion of the web page in a piece-wise-linear fashion;

compressing and buffering a portion of the user activity information; and

transmitting to a tracking entity, at least a compressed portion of the user activity information when a first transmission criterion is fulfilled.

('525 patent col. 16 ll. 59-67; *id.* col. 17 ll. 1-26).

According to plaintiffs, one "meaningful[]" difference between the methods disclosed by the patents is that claim 1 of the '081 patent requires a "tracking element that could execute on a remote server," while the claim 1 of the '525 patent requires a "tracking code that executes on a user's computer." (Pl. Opp. at 15 (internal quotation marks and emphasis omitted)). They also contend that the '081 patent includes further limitations that recite "improvements" that are "specifically relevant to the fact that the patent's tracking element may reside on a remote server." (*Id.* (internal quotation marks omitted)).

### a.   Step One:  Patent-Ineligible Concept

Defendants contend that the claims of the '081 patent and the '525 patent are directed to patent-ineligible concepts because they are directed to "the same kinds of abstract collection, manipulation, and provision of information as the claims of the other Asserted Patents." (Def. Mem. at 19). They again rely on the *Electric Power Group* family of cases. But that characterization appears to oversimplify the relevant claims and ignore technological improvements disclosed in the patents.

For example, the common specification of the patents describes improved methods of compression, such as using "[s]horter code-words [to] represent more frequently occurring

events," "representing numerical values in a base that is larger than ten" so that "larger numbers are defined by fewer bits," and "encoding sign and length of parameters in the operation code of the event." ('081 patent col. 7 ll. 17-32; '525 patent col. 7 ll. 6-21). It similarly describes technological improvements to buffering and transmitting user-activity data. (*See, e.g.*, '081 patent col. 7 ll. 36-42 ("By buffering user activity information relating to multiple events and encapsulating user activity information related to multiple events 40 within a single message, packet or frame, the amount of transmitted information is reduced."); '525 patent col. 7 ll. 27-31 (same); '081 patent col. 7 ll. 43-47 ("The transmission can occur when a transmission criteria is fulfilled. The transmission criteria can be responsive to: the buffer exceeding a certain size limit, a certain amount of time has passed from the last transmission, an occurrence of a prioritized or highly interesting event, and the like."); '525 patent col. 7 ll. 32-36 (same)). Disclosure of such technological improvements indicates that the claims of the '081 patent and '525 patent are not directed to an abstract idea; instead, they disclose a method "specifically designed to achieve an improved technological result in conventional industry practice." *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1316 (Fed. Cir. 2016); *see also DataTern, Inc. v. Microstrategy, Inc.*, 2015 WL 5190715, at *8 (D. Mass. Sept. 4, 2015) ("[T]he claimed solution of the '502 patent is 'necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks.'" (quoting *DDR Holdings*, 773 F.3d at 1257)).

Furthermore, and in any event, determining the patent eligibility of the '081 patent and the '525 patent likely turns on issues of claim construction. Claim 1 of the '081 patent, for instance, recites a method that includes "compensating for differences between a visual representation, on a tracking display, of the web page and between a visual representation of the web page on another display," which allows for comparable session replays across different

playback device. ('081 patent col. 17 ll. 32-35). Plaintiff thus contends that the "compensating"

limitation requires claim construction to decide the § 101 issue because "[a]t a minimum, the

claim must be construed to require the generation of invariant user activity information to enable

the recited 'compensating.'" (Pl. Opp. at 18-19). Indeed, the exact nature of that limitation—

and thus whether it is directed to an abstract concept—is unclear from the face of the patent.

Similarly, claim 1 of the '525 patent requires the use of "non-linear transformation"

comprising converting each webpage element "in a piece-wise-linear fashion." ('525 patent col.

17 ll. 19-21). That transformation allows for conversion of the "user activity information in the

invariant form" to a form appropriate "for a playback display." (*Id.* col. 17 ll. 10-17).

Defendants contend that "this requirement is an essentially mental or mathematical, and thus

abstract, process." (Def. Mem. at 20). But it is far from clear, upon the record before the Court,

what the correct meaning of the term "non-linear transformation" is and therefore whether it is

an abstract process that could be performed mentally or by hand. Even though "claim

construction is not an inviolable prerequisite to a validity determination under § 101," the § 101

determination requires "a full understanding of the basic character of the claimed subject

matter." *Content Extraction*, 776 F.3d at 1349. Here, plaintiffs contend that the term "user

activity information" should be construed as "comprising instructions for a computer about how

to compensate between different visual representations on playback devices." (Pl. Opp. at 19).

Defendants propose no competing claim construction, let alone a construction supported by the

record that indicates that the claim is directed to an abstract concept.

Accordingly, the Court cannot conclude at this stage that the claims of the '081 patent

and the '525 patent are directed to patent-ineligible subject matter. Defendants' motion to

dismiss the claims of infringement of the '081 patent and the '525 patent will therefore be

denied.

## IV.  **<u>Conclusion</u>**

For the foregoing reasons, defendants' motion to dismiss is GRANTED, to the extent that

it seeks dismissal of the claim of infringement of the '737 patent, and is otherwise DENIED.

**So Ordered.**

/s/ F. Dennis Saylor IV

F. Dennis Saylor IV

Dated: July 23, 2021                    Chief Judge, United States District Court